IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| SMITH & LOVELESS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-2384-JPO |
| | ) | |
| CAICOS CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM AND ORDER**

### I.  Introduction

This is a "battle of the forms" contract case under section 2-207 of the Uniform Commercial Code ("UCC").  The plaintiff, Smith & Loveless, Inc. ("Smith"), claims that the defendant, Caicos Corporation ("Caicos"), breached a contract for the sale of four specially manufactured wastewater pumps and related equipment, by failing to make full payment. Caicos has counterclaimed, asserting that the pumps and related equipment were delivered late and in defective and incomplete condition.

The court has diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). Smith, the seller of the goods in question, is a Kansas corporation with its principal place of business in Lenexa, Kansas.  The buyer, Caicos, is a Washington corporation with its principal place of business in Port Gamble, Washington.  Smith filed suit in the District Court of Johnson County, Kansas, and Caicos removed the case to federal court.

Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73, the parties consented to the disposition of this case by U.S. Magistrate Judge James P. O'Hara, and also waived a jury trial. A three-day bench trial was held in late November 2006. The court reporter filed the transcript of trial proceedings in late December 2006 (*see* docs. 68-70). As required by Fed. R. Civ. P. 52(a), this memorandum and order will serve as the court's findings of fact and conclusions of law.

## II.   Findings of Fact

The final pretrial order filed pursuant to Fed. R. Civ. P. 16 on December 7, 2005 (doc. 36, pp. 3-4), reflects that the parties have stipulated to many of the material facts of this case. Highly summarized, there is no dispute that Smith and Caicos entered into an agreement for the purchase and sale of the Smith pumps and control panels. The dispositive issue in this case is whether Smith or Caicos, or both, breached the agreement. To reach that question, of course, the court must first determine the terms of the agreement.

As related to the disputed aspects of this case, the court has reviewed the trial record in light of Smith's and Caicos' proposed findings of fact and conclusions of law (docs. 64 & 55, respectively). Having had an opportunity to observe and reflect on the credibility of the various witnesses' testimony and to assess the relative weight of all the evidence that was admitted, documentary and otherwise, the court will now proceed to find the material facts.

Smith is a manufacturer of wastewater pumps and related equipment. Caicos is a general contractor. In early May 2002, after a competitive bid process, Caicos was awarded the general contract by the Northshore Public Utility District ("Northshore") for the

Northshore Lift Station Nos. 1 and 2 Rehabilitation Project, a public works construction project located in Kenmore, Washington (the "project"). Exhibits 410 & 411. The project's plans and specifications called for Caicos to retrofit two wastewater lift stations and, in pertinent part, to install two Smith pumps with control panels in each station. Exhibit 529, p. 64.

As part of Northshore's bid process for the project, on April 30, 2002, Smith's sales representative, ADS Equipment, Inc. ("ADS"), had distributed a seven-page packet to the bidding contractors, including Caicos. Exhibit 2. This packet consisted of five documents: (1) a fax cover sheet confirming that ADS was Smith's representative for the project; (2) a scope letter for ADS' proposal to furnish and deliver Smith equipment for the project; (3) a proposed equipment list specifically describing Smith's pumps and control panels for the two lift stations; (4) drawings of the two lift station plans; and (5) a preprinted set of terms and conditions that Smith customarily uses for the sale of equipment. Exhibit 2. Significantly, the above-referenced scope letter specifically stated that the proposal was "subject to Smith & Loveless terms and condition of sale form attached." Exhibit 2, p. 3.

The April 30, 2002-packet did not contain price information. But, on May 1, 2002, ADS provided the bidding contractors with a $106,044 price quotation for the supply of the Smith pumps and control panels.

During May and early June 2002, after Caicos had been awarded the general contract by Northshore, Caicos' president, David Berry, and ADS' president, Steve Azose, spoke by telephone about Caicos' intended purchase of the Smith pumps and control panels. On June

11, 2002, Azose faxed a message to Tom Byrne of Smith requesting that Smith "enter order PO # 315-02 and start submittals" for the pumps and control panels.  Exhibit 5.  Azose also stated Caicos would send a "formal" purchase order within the next few days.  *Id.*  On June 17, 2002, Jane Meulendyke of Smith prepared a Retrofit Pump Order, listing Caicos as the purchaser.  Exhibit 414.  On June 18, 2002, Melissa McKelvey of Smith sent Berry a letter which stated:  "Thank you for the awarded [Northshore] contract referred to above. . . . Please be advised that we are reviewing your order and will acknowledge it shortly.  Exhibit 6.  That same day, Sara Ross of Smith requested, by fax, that ADS obtain a signed original copy of the "Sales Agreement/Purchase Order" from Caicos.  Exhibit 417.  At that time, Smith had "already begun processing the order and [ADS]'s assistance in this matter will prevent delays."  *Id.*  On June 20, 2002, Meulendyke of Smith faxed Azose of ADS asking if he had received a "REAL" purchase order from Caicos.  Exhibit 7.  Meulendyke stated that "credit is going to make me put this on hold if we don't get [a written purchase order] soon." *Id.*

On June 25, 2002, Caicos' project superintendent, Luke Ivey, faxed Azose a one-page written purchase order for "Smith & Loveless, Inc. Model [4B2B/4B3B] Assembly per ADS Equipment, Inc. 'Proposed Equipment List' dated April 30, 2002."  Exhibit 422.  Azose forwarded Caicos' written purchase order to Smith on June 26, 2002.  Exhibit 423.

On July 15, 2002, McKelvey of Smith sent Caicos a letter that stated it had received a fax copy of the front side only of the purchase order and that it was "recognizing this fax copy as the contract between us."  Exhibit 9.  The letter also stated that Smith was "enclosing

a copy of its corporate terms and conditions, which are incorporated herewith." *Id.* Such terms and conditions (the "July Terms") are not identical to those that were contained in the packet distributed on April 30, 2002 (the "April Terms"), but they are very similar.[1] Caicos did not object verbally or in writing to the April Terms or to the July Terms before or within a reasonable time after taking delivery of the pumps and control panels from Smith.

Smith shipped the pumps and control panels to Caicos in late November 2002. Caicos withheld payment of $53,022 out of the overall $106,044 purchase price.

As is not unusual in construction cases, there is no single contract document governing the transaction at issue in this case. From April 30, 2002, when ADS distributed Smith's bid packet to Caicos and the other bidding contractors on the Northshore project, until the pumps and control panels were online and fully operational in March 2003, the parties corresponded back and forth with each other frequently by telephone, facsimile, and

---

[1] The differences are not material for the issues in dispute in this litigation. The two sets of terms and conditions differ as follows: (1) the April Terms contain no forum selection clause; (2) the July Terms require buyer to reimburse seller in full for "damages" incurred "with respect to buyer's breach of this Sales Agreement or the collection of past due amounts," while the April Terms require reimbursement only for "collection costs or charges" incurred "with respect to the collection of past due amounts"; (3) the July Terms require "immediate" notification of damages, shortages or nonconformance of goods, and increase storage fees to 2% of the "purchase price," as opposed to the "balance due"; (4) the July Terms contain more elaborate terms regarding firm orders, providing, for example, that prices are firm for sixty days after the bid date if a firm order is received within that time period; and (5) the July Terms add "factory capacity" as a basis for "excused performance." The July 15, 2002 letter, to which the July Terms are attached, also states that "our payment terms are Net 30 days from date appearing on invoice or at start-up, whichever occurs first. We do not allow a cash discount, and we must impose a delinquency charge of 1.7% per month on any delinquent balance." It also provides that shipping terms are F.O.B. factory.

mail.  There is no dispute as to the general description of the goods to be supplied or the price of those goods.  The dispute in this case centers on the delivery date and condition of the goods, whether the agreement required the goods to bear specific types of industry ratings, and the payment terms of the transaction; the only payment terms that are disputed involve a non-mutual attorney's fee provision that operated in favor of the seller (Smith) and whether the seller is entitled to recover prejudgment interest at a contractual rate substantially in excess of that provided by Kansas law, K.S.A. § 16-201.  To determine whether each party's performance was sufficient under the terms of the agreement, the court must determine what the terms of the agreement actually were, and thus, must first focus its factual findings on the formation of the contract between Smith and Caicos.

Although the final pretrial order reflects it is uncontroverted the parties entered into *an* agreement for the purchase and sale of the Smith pumps and control panels to be used in connection with the Northshore project (*see* doc. 36, pp. 7-8), there is clearly a dispute about the *terms* of the parties' contract.  During trial, the parties focused on five specific documents as evidence of their agreement:  (1) Smith's April 30, 2002 bid packet; (2) Smith's May 1, 2002 price quotation; (3) Caicos' June 25, 2002 written purchase order; (4) Smith's July 15, 2002 letter and attachments; and (5) the plans and specifications for the Northshore project. *See* Exhibits 2, 3, 422, 9, and 529, respectively.

Smith contends the parties' contract consists of the April 30, 2002 bid packet, the May 1, 2002 price quotation, the June 25, 2002 written purchase order, and the July 15, 2002 letter and attachments.  Smith argues that Caicos breached the parties' contract by failing to remit

payment in the full amount of $106,044 within thirty days of shipment, as stated in the terms and conditions contained in the April 30, 2002 bid packet, as well as the July 15, 2002 letter and its attached terms and conditions.  Pursuant to the July 15, 2002 letter, Smith also claims it is entitled to 1.7% per month in prejudgment interest as a delinquency charge on the amount owed.

Caicos contends the parties' contract consists of the project plans and  specifications and the June 25, 2002 written purchase order, the latter of which specifically incorporates by reference the proposed equipment list contained in the April 30, 2002 bid packet.  Caicos argues that Smith breached the parties' contract by failing to deliver equipment that was "UL" listed and "SUSE" rated,[2] as required by the project plans and specifications, by failing to timely deliver the pumps and control panels, and by failing to include certain pieces of equipment when the pumps and control panels finally were delivered.  Although Caicos admits there is no delivery date specified in the documents it claims comprise the contract, Caicos asks the court to impose a commercially reasonable date, which it asserts should be November 6, 2002, as allegedly orally promised by Smith during the parties' course of dealing.

Steve Azose, president of and sales representative for ADS, and David Berry, president of Caicos, each testified as to the customary design, bid, equipment purchase, and

---

[2] A UL listing is a stamp of approval from Underwriters Laboratory on the pump motors.  A "SUSE" rating, generally described, is an approval of the service entries on the control panels.  The parties' evidence at trial never precisely established whether SUSE is an acronym, or specifically what it means.

installation process for public works projects such as the Northshore project in the instant litigation. Both of these witnesses are very experienced in the industry. Azose is a sales representative for three companies other than Smith that all sell and manufacture equipment related to the wastewater process and treatment industry. He has twenty-six years of experience. Berry founded Caicos in 1984 and has been involved in approximately 400 public works projects since then. He worked briefly for another contractor prior to founding Caicos.

According to Azose, the public works construction process usually begins in the predesign stage with the identification of a problem by a utility district such as Northshore. The district then hires a consulting engineer to develop various options to solve the problem. After funding is arranged, the engineer designs the project. Next, the utility district makes a formal request for bids from general contractors. This is usually a thirty-day process and a public offering. The bids are to be based on the engineer's plans and specifications. The district then awards the contract to one of the bidders. That contractor purchases the equipment required by the engineer's specifications from the available suppliers.

The project in this case was a bit unusual in that the plans and specifications prepared by Northshore's engineer, Gray & Osborne, specifically called for Smith pumps. This was because the engineer and Smith had previously enjoyed a good relationship. Northshore, however, had never dealt with Smith, nor had Caicos. Through Gray & Osborne, Smith was fully aware of the fact that Northshore would be inviting competitive bids from Caicos and other contractors for the project, and that the project would call for installation of Smith

pumps and related equipment as part of the project.

The actual contract formation process between a particular supplier of equipment and a contractor typically begins *after* development of the plans and specifications. Upon review of those plans and specifications, the supplier offers a proposal of the equipment it wishes to furnish for the project. That proposal is usually given to the bidding contractors prior to the bid opening. According to Azose, the price for the equipment is given to the bidding contractors on the day of the bid opening. After a particular contractor wins the bid and chooses a supplier, the contractor issues a written purchase order for the equipment. Upon receipt of a purchase order, the supplier sends an acknowledgment of it along with any questions, as well as any terms and conditions it may require.

With specially manufactured equipment such as the pumps involved in this case, the supplier next furnishes "submittals," which are documents that detail the equipment the supplier plans to furnish. The purpose of the submittals is to ensure that both the engineer and the utility district are satisfied the equipment to be provided will work properly with all other equipment to be used in the project, i.e., whether the proposed equipment meshes with the plans and specifications. After the engineer and the district approve the submittals, the supplier builds and ships the equipment to the contractor for installation. After installation and start-up of the equipment, the contractor develops a punch list of any items that do not meet the project specifications. According to Azose, once the punch list items are corrected, the contract is complete.

Berry's testimony indicates that he generally agrees with Azose as to the typical

sequence of events in public works projects.  He disagrees, however, in some critical respects.  According to Azose, at least for major pieces of equipment, the purchase order issued from the contractor to the supplier is *always* written.  Berry, however, testified that he felt a verbal purchase order would be sufficient to get the submittal process started.

On the point of whether a written purchase order is required in the public works field for the purchase of major pieces of equipment, the court finds Azose very persuasive.  With no disrespect intended, the court finds Berry's testimony on this point wholly unpersuasive.

The evidence presented in this case makes clear that a written purchase order was critical to keep the Northshore project moving on schedule.  The notion that Smith or *any* reasonable company would sell over $100,000 of specially manufactured equipment to Caicos on the strength of a verbal purchase order, when the buyer and seller had *no* prior course of dealing, is nothing short of preposterous.

Berry also testified that he did not believe the Smith's preprinted terms and conditions were binding on Caicos <u>unless</u> he signed them.  Significantly, Berry conceded that he only scanned the terms and conditions contained in the April 30, 2002 bid packet before issuing Caicos' purchase order.   The terms and conditions contained in the April 30, 2002 bid packet, and those attached to the July 15, 2002 letter, state:  "Buyer's execution of this Agreement constitute Buyer's offer to purchase, on the terms and conditions set forth on the face and reverse sides hereof, the equipment described on the face hereof, and such offer is irrevocable for 30 days after Buyer executes and delivers to Seller this Agreement together with all necessary engineering data and information."  Exhibits 2 and 9.  Although Berry was

very polite throughout trial and is obviously knowledgeable about his line of business, the court finds his assertion at best to be untenable and a product of wishful thinking.  That is, based on Berry's testimony, the court is unpersuaded that he actually thought the terms and conditions would be inapplicable if he just kept silent after receipt.   In fact, the only reasonable inference that may be drawn from the trial record as a whole is, *if* Berry had notified Smith or ADS of Caicos' objections to the terms and conditions within a reasonable amount of time after receipt, the instant litigation would have been avoided entirely.  Caicos may not have been able to buy the pumps from Smith, but still the litigation would have been avoided.  Here, it is obvious that Berry consciously decided not to force the issue by protesting the terms and conditions in the July 15, 2002 letter and attachments.  He knew, however, were he to force the issue, there was a very high probability that Caicos would not be able to buy the equipment from Smith, and in turn Caicos would not be able to perform its contract with Northshore.

Frank Rebori, Smith's vice-president and general counsel, testified that the only substantive change from the terms and conditions contained in the April 30, 2002 bid packet to those attached to the July 15, 2002 letter was a dispute resolution clause providing for venue in Kansas.  He stated that any other differences were minor and did not affect the claims in this case.[3]  Notably, he also confirmed that he received no objection from Caicos as to the terms and conditions at *any* time, and Caicos never disputed this during trial.

---

[3] *See also* note 1 above.

Luke Ivey, Caicos' superintendent for the Northshore project, testified as to his involvement with the project. Although Ivey seems to be a talented young man, he was not very credible, at least in the sense that the court did not find his testimony as helpful as the other witnesses' – the Northshore project was his first pump station job.

Throughout trial, witnesses for each party made various assertions as to which of the documents exchanged among Northshore, ADS, Smith, and Caicos actually became part of the contract between Smith and Caicos. Upon review of each of these documents, and in light of the general process for public works projects, as well as the sequence of events for this particular project, the court finds that Smith and Caicos entered into a contract for the sale and purchase of the pumps and control panels for $106,044, subject to the project plans and specifications, as well as the terms and conditions set forth in the April 30, 2002 bid packet and the July 15, 2002 letter and attachments.

The April Terms state that Smith's interest rate on delinquent balances is 2% per month. The July 15, 2002 letter states that the interest rate is 1.7% per month. Throughout the course of this litigation, Smith has made clear it is seeking the lower rate. Accordingly, and in light of the court's finding that the July 15, 2002 letter is part of the contract, the 1.7% interest rate on delinquent balances applies to the parties' transaction.

The April Terms, as well as the July Terms, make clear that Smith required payment of the contract price within thirty days of shipment. Smith shipped the pumps on November 22, 2002 and the control panels on November 26, 2002. Exhibits 22 & 23. Accordingly, under the terms of the contract, payment in full was due no later than December 26, 2002.

On February 13, 2003, Caicos issued a check for $53,022, which Smith received on February 24, 2003.  Exhibit 45.  Caicos withheld the remaining half of the amount due to offset the costs that Caicos claims it incurred as a result of Smith's late delivery of non-conforming goods.

Specifically, Caicos claims as follows: (1) six days of delay due to the control panels being shipped to the project site separately from the pumps, resulting in a $6,958.71 cost to Caicos; (2) twenty-five days of delay due to missing parts, resulting in a $28,994.62 cost to Caicos; and (3) twenty-seven days of delay due to issues with the rating and labeling of the pumps and control panels, resulting in a $31,314.18 cost to Caicos.  Exhibit 528.

Stephen Dennehy was Northshore's senior in-house engineer at the time of the project.  He is a professional engineer licensed by the state of Washington.  He testified at trial by video-taped deposition ( doc. 67 (transcript), & Exhibit 98 (video)).  At the time in question, Dennehy had worked for Northshore for approximately five years.  Under vigorous cross-examination by Caicos' counsel, Dennehy strongly disagreed with Caicos' claim that Smith caused a total of fifty-eight days of delay in getting the pumps started up.  He testified the pumps were ready for start-up around March 4, 2003 and that they were actually started on March 18 and 19, 2003.  Although Dennehy acknowledged there was *some* down time in getting the pumps started, he testified the delay was mainly attributable to Caicos' refusal to pay Smith, as well as long lead times in getting the submittals to Northshore for approval and Caicos' work on another project.

Dennehy was specifically concerned with Caicos' "lack of timely submittals."  Exhibit

54.  Dennehy explained that "we [Northshore] told [Caicos] in the letter of March 6th that basically we felt that had they done the submittal process properly and started it early on, I don't think we would have been in that boat because I think things would have been handled a lot sooner than that, because we got first submittals 11 weeks after we gave notice to proceed."[4]  Also, according to Dennehy, the issues regarding the rating and labeling of the pumps and control panels was easily resolved within a few weeks of identification of the issues.  The court finds Dennehy to be extremely credible.  He has no ax to grind and was in a good position to observe any delay in start-up and the causes of such delay.

Azose testified that, although the pump motors were not initially UL listed, they were "CSA" listed, which is the Canadian equivalent.  According to Azose, once Caicos notified him that Caicos wanted a UL listing, the issue was easily resolved.  Azose claims the electrical inspector did not require the UL listing and the lack of a UL listing did not delay start-up of the pumps.

Azose also discussed the parts that were missing from Smith's initial shipment of the pumps:  reducing elbows, flange fillers, gaskets, bolts, and nuts.  His testimony establishes the missing reducing elbows were eventually supplied and, in any event, the pumps were not ready for start-up at that time because the electrical work was incomplete.  Azose testified

---

[4] Dennehy Depo., doc. 67, pp. 86:23-87:3.  The court finds that the delay in getting the submittals started was due to Caicos' delay in submitting a written purchase order, despite several requests from Azose (on behalf of Smith) to get a written purchase order in place.  That is, for obvious practical reasons, Smith was unwilling to make the substantial time investment on the submittals unless it knew that Caicos was committed in writing to buy (and pay for) the specially manufactured equipment.

that a machine shop could specially fabricate flange fillers in less than a day and a half.  He said that nuts, bolts, and gaskets could be found at a local hardware store.

Billy Joe Wahl was the primary electrician on the project.  He has been employed by Bainbridge Island Electric ("Bainbridge") for approximately ten years and has a total of thirty-two years experience as an electrician.  Like Dennehy, Wahl has no financial interest in the outcome of this case.  He testified by video-taped deposition (doc. 66 (transcript) & Exhibit 97 (video)).  He testified that when the control panels arrived to the project site from Smith, they were not SUSE rated, as required by the state of Washington.  He did *not* recall, however, this issue as causing significant downtime to Bainbridge in performing the electrical work for the project.  He also testified there was some delay due to missing parts, but overall, his testimony simply does not support Caicos' assertion that any delay in start-up of the pumps was due to Smith's failure to perform under the contract.

Loren Mattingly is Smith's manager of warranty coordination.  He candidly acknowledged the reducing elbows were missing in Smith's initial shipment of the pumps.  Mattingly testified that Ivey notified him of the mistake on December 13, 2002.  Mattingly established that Smith then sent the reducing elbows and that they arrived on site by January 3, 2003.  He received a second call from Ivey on December 17, 2002 regarding the missing flange fillers, gaskets, nuts, and bolts.  Although Mattingly's records indicated those parts *had* been included with the initial shipment, he offered to replace the parts at Smith's expense.  He also confirmed Caicos could have obtained flange fillers locally from a machine shop or other pipe supplier and the gaskets, nuts, and bolts could have been purchased at a

local hardware shop.

In light of all of the foregoing, the bottom line is this – the court agrees with Dennehy that the delay in starting up the pumps was largely due to Caicos refusal to pay the balance of the contract price.  Based on the testimony of Dennehy, Azose, Wahl, and Mattingly discussed above, the court finds that Caicos was not justified in withholding payment due to its belief that Smith was in breach of the agreement.

As to Caicos' claim of delay due to late shipment of the control panels, the court notes that even Berry acknowledges there is no delivery date specified in any of the documents comprising the contract between Smith and Caicos.  Instead, Caicos asks the court to imply a required delivery date of November 6, 2002.  The court declines to do so and finds the shipment of the pumps on November 22, 2002 and the shipment of the control panels on November 26, 2002 were commercially reasonable and, in any event, it did not cause any significant delay to Caicos in proceeding with the project.  Smith, Caicos, and Northshore all were fully aware of the fact that it could take at least ten weeks from the engineer's approval of the submittals for Smith to manufacture the subject equipment.  The submittals were not approved until on or about September 24, 2002.  The fact the pumps and control panels were shipped separately likewise did not impact start-up of the project.

The court is also unpersuaded by Caicos' claim of delay due to missing parts.  As discussed above, these parts could have been quickly and easily replaced by Caicos.  The witnesses for Smith were candid in acknowledging the missing parts.  And, in response, Smith has reduced the claimed balance owed by $1,343.02.  Exhibit 64.

As to the issues regarding the UL and SUSE ratings, the court agrees with Dennehy and the others that these issues were easily resolved once they were identified.  The court finds that start up was not significantly delayed while Caicos was awaiting resolution of the ratings issues.

Based on the foregoing testimony and exhibits, the court finds that Caicos breached the contract by failing to remit timely payment in full according to the terms of the contract. Smith incurred damages in the amount of $51,678.98, i.e., the $53,022.00 delinquent purchase price balance, less the $1,343.02 credit for the missing parts.  According to the terms of the agreement, Smith is also entitled to collect interest on the delinquent amount at the rate of 1.7% per month, beginning on December 26, 2002, the date that payment was due.

As to Caicos' counterclaim, the court finds that Smith substantially completed performance as required by the contract.  There was no significant delay in starting up the pumps.  The delay that did occur was due to the dispute over payment of the contract price.

### III.   Conclusions of Law

Based on and in light of the foregoing findings of fact, the court draws the following conclusions of law:

A.      Personal Jurisdiction

In its order of June 29, 2005 (doc. 29), the court denied Caicos' motion to dismiss, finding that Smith had demonstrated an adequate basis for the court to exercise personal jurisdiction over Caicos pursuant to the Kansas long-arm statute, K.S.A. § 60-308(b).  For purposes of appeal, in an abundance of caution, the court will further address the issue of

personal jurisdiction.

In diversity actions, personal jurisdiction over a nonresident defendant is determined by the law of the forum state.[5]  To exercise personal jurisdiction over a nonresident defendant, the court must ensure that "the exercise of jurisdiction is sanctioned by the long-arm statute of the forum state" *and* that the due process requirements of the Constitution are satisfied.[6]  Notably, the Kansas long-arm statute has been interpreted "to allow jurisdiction to the full extent permitted by due process."[7]

As to the due process requirement, the Tenth Circuit has approved a three-part test.[8]  First, the defendant must have purposefully availed himself of the benefits of conducting activities in the forum state.[9]  Second, the defendant must have sufficient contacts with the forum state that the exercise of personal jurisdiction will not offend traditional notions of fair play and substantial justice.[10]  Third, the quality and nature of the defendant's contacts must

---

[5] *Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*, 17 F.3d 1302, 1304 (10th Cir. 1994) (citing Fed. R. Civ. P. 4(e)).

[6] *Id.* at 1304-05 (citing *Taylor v. Phelan*, 912 F.2d 429, 431 (10th Cir. 1990)).

[7] *Id.* at 1305 (citing *Volt Delta Resources, Inc. v. Devine*, 241 Kan. 775, 740 P.2d 1089, 1092 (1987)).

[8] *Rambo v. Amer. S. Ins. Co.*, 839 F.2d 1415, 1419 n.6 (10th Cir. 1988); *Marcus Food Co. v. Family Foods of Tallahassee, Inc.*, 729 F. Supp. 753, 757-58 (D. Kan. 1990).

[9] *Id.* at 758 (citing *Hanson v. Denckla*, 357 U.S. 235 (1958)).

[10] *Id.* at 758 (citing *World-Wide Volkswagen v. Woodson*, 444 U.S. 286 (1980); *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)).

be such that it is reasonable to require him to appear in the forum state.[11]

The Kansas long-arm statute provides:

> (1) Any person, whether or not a citizen or resident of this state, who in person or through an agent or instrumentality does any of the acts hereinafter enumerated, thereby submits the person and, if an individual, the individual's personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of these acts:
>
> . . . .
>
>> (E) entering into an express or implied contract, by mail or otherwise, with a resident of this state to be performed in whole or in part by either party in this state . . . .[12]

The court finds that Caicos purposely availed itself of the benefits of conducting activities in Kansas. Caicos' bid on the Northshore project required not just any pumps, but rather the installation of Smith equipment. Caicos then proceeded to enter into a substantial contract with Smith for the required equipment. The court finds through this process, Caicos has had sufficient contacts with Kansas so as not to offend traditional notions of fair play and substantial justice. In light of the circumstances, the court also finds it was reasonable to require Caicos to appear and defend in Kansas. As to the Kansas long-arm statute, the evidence in this case clearly establishes the pumps and control panels were manufactured and assembled in Kansas. Thus, at least part of the performance of the contract occurred within

---

[11] *Id.* at 758 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945); *Burger King v. Rudzewicz*, 471 U.S. 462 (1985)).

[12] K.S.A. § 60-308(b)(1)(E).

the state.  The court therefore concludes that its exercise of personal jurisdiction over Caicos is proper.

B.      Contract Formation

Section 2-204 of Kansas' version of the UCC provides:

> (1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.
> (2) Any agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.
> (3) Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.[13]

Although the exact moment of formation is undetermined, the court finds the parties' conduct from late April 2002 on was sufficient to establish that Smith and Caicos had reached an agreement regarding the description, quantity, and price of the pumps and control panels for the Northshore project.  For this reason, and those discussed in section II above, the court concludes as a matter of law that Smith and Caicos entered into a contract for the sale and purchase of the pumps and control panels for $106,044.  As previously established, Caicos breached this contract by failing to remit payment in full when it was due.  Accordingly, Smith is entitled to recover the unpaid balance of the contract.

---

[13] See K.S.A. § 84-2-204.  Although Caicos has stated on occasion that Washington law may apply to this case, the parties have declined two invitations from the court to explain how Washington law would apply and, if so, how it materially differs from Kansas law in this area.

C.      Prejudgment Interest and Attorney's Fees

Smith asserts that it should be awarded prejudgment interest in addition to the unpaid contract balance at a rate of 1.7% per month pursuant to the July 15, 2002 letter.  Smith suggests that interest should be charged at this rate for two months on the unpaid balance of $104,700.98 (from December 26, 2002, the date payment was due, to February 24, 2003, the date partial payment was made) and then on the remaining outstanding balance of $51,678.98 to date.  As earlier indicated, Caicos maintains that the interest rate set forth in the July 15, 2002 letter was not part of the parties' contract under UCC § 2-207.

Section 2-207 of the UCC provides:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on asset to the additional or different terms.
> (2) The additional terms are to be construed as proposals for addition to the contract.  Between merchants such terms become part of the contract unless:
> > (a) the offer expressly limits acceptance to the terms of the offer;
> > (b) they materially alter it; or
> > (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received. . . .[14]

Regardless of whether contract formation had already occurred by July 15, 2002, or occurred by operation of the July 15, 2002 letter, section 2-207 applies.  In the case of the former, the

---

[14] K.S.A. § 84-2-207.

letter would have been a written confirmation.  In the case of the latter, the letter would have been an expression of acceptance.

Smith and Caicos agree that both of them are merchants under the UCC,[15] and therefore the second half of section 2-207(2) applies.  Under that section, the terms stated in the July 15, 2002 letter automatically become part of the contract unless one of the three exceptions applies.  No evidence was adduced at trial that any offer was made which expressly limited acceptance to its terms.  As discussed in section II, Caicos never objected to the terms set forth in the letter.  Thus, the parties acknowledged during trial that the dispositive factual inquiry is whether the 1.7% interest rate and the attorney's fee provision in Smith's July 15, 2002 terms and conditions materially alters the parties' agreement.

Prior to Caicos' bid on the Northshore project, ADS supplied Caicos with Smith's standard terms and conditions in the April 30, 2002 bid packet.  Those terms and conditions included a provision for a monthly interest charge of 2% on delinquent balances and an attorney's fee provision.  Without objecting to those terms, Caicos bid on the project and proceeded to communicate with ADS regarding the purchase of the Smith equipment.  Caicos then issued a purchase order and was aware that submittals began at that time.  After receipt of the July 15, 2002 letter (which contained the 1.7% interest rate), and its attached terms and conditions (which contained a 2% interest rate), Caicos did not object or ask for

---

[15] "'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction . . . ."  K.S.A. § 84-2-104(1).

a lower interest rate.  Nor did Caicos object to the attorney's fee provision, even though as earlier indicated it operated only in favor of the seller (Smith).  Given the way in which the parties' contract was negotiated, the court finds that the 1.7% interest rate and the attorney's fee provision included in the letter did not materially alter the terms as stated in Caicos' purchase order.

D.     Caicos' Counterclaim

Caicos contends Smith breached the parties' agreement by failing to deliver equipment that was UL listed and SUSE rated, as required by the project specifications, by failing to timely deliver the pumps and control panels, and by failing to include certain pieces of equipment with the pumps and control panels.  As established in section II, however, the court is wholly unpersuaded that any of these issues caused any significant delay in getting the pumps started up by Northshore.  Accordingly, the court finds that Caicos did not suffer any damage as a result of any breach by Smith.  Thus, Caicos was not entitled to withhold payment of the contract balance and is likewise not entitled to recover any additional amount in this case.

IV.   Conclusion and Order

In consideration of the foregoing,

IT IS HEREBY ORDERED:

1.     Judgment shall be entered by the Clerk, in favor of Smith on its breach of contract claim against Caicos, for $96,695.78 (representing the sum of the $51,678.98 unpaid contract balance; $41,505.73 in prejudgment interest at a rate of 1.7% per month on that

amount from February 24, 2003 until February 1, 2007; and $3,511.07 in prejudgment interest at a rate of 1.7% per month on the $104,700.98 that remained unpaid from December 26, 2002 until February 24, 2003).  In addition, the judgment shall provide that Smith is entitled to recover its attorneys' fees and the taxable costs of this action from Caicos.  *See* Fed. R. Civ. P. 54(d).  *See also* D. Kan. Rule 54.1(a).

2.      During trial, counsel for Smith indicated that his attorneys' fees for this case were approximately $30,000 prior to trial.  The court has no reason at this juncture to believe this amount is unreasonable.  Nonetheless, within the time allowed by Fed. R. Civ. P. 54(d)(2), and after the parties confer as required by D. Kan. Rule 54.2, Smith may file a motion to amend the court's findings and judgment so as to include an award in a specific amount of all attorneys' fees incurred by Caicos through trial.

3.      Caicos' counterclaim of breach of contract against Smith is dismissed, with prejudice.

Dated this 1st day of February, 2007, at Kansas City, Kansas.


    s/ James P. O'Hara
James P. O'Hara
U.S. Magistrate Judge

O:\M & O\04-2384-JPO.wpd

-24-